UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEVIN SMITH,                          )
                                      )
            Petitioner,               )
                                      )
    vs.                               )        No. 4:03CV00354 DJS/AGF
                                      )
MICHAEL MURPHY,                       )
                                      )
            Respondent.               )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the petition of Missouri state prisoner Kevin

Smith for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action was referred

to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for recommended

disposition.  For the reasons set forth below, the Court recommends that federal habeas

relief be denied.

On June 20, 1997, Petitioner and co-defendant Robert Belford were convicted by a

jury in the Circuit Court of St. Louis County, Missouri, of first-degree assault and armed

criminal action. The charges arose out of the April 16, 1996 shooting of Ernest Lloyd.

Petitioner was sentenced as a prior and persistent offender to two concurrent 12-year

terms of imprisonment.  His convictions and sentences were affirmed on direct appeal.  In

the present action, Petitioner, who is African-American, asserts that his constitutional

rights were violated in the following ways:

(1)      The trial court improperly denied his motion for a mistrial after a police officer testified that in preparing a photograph spread for identification, he obtained Petitioner's photograph from police files;

(2)      The trial court improperly refused to instruct the jury on third-degree assault; and

(3)      The prosecutor's use of peremptory strikes against three African-American venirepersons violated <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).[1]

Respondent argues that habeas relief should be denied because the state courts' adjudication of Petitioner's claims did not involve an unreasonable application of federal law or an unreasonable determination of the facts.

## <u>BACKGROUND</u>

### <u>Motions In Limine</u>

Defense counsel moved to exclude any information or testimony to the effect that the "LID" photographs of Defendants used by the police in photograph spreads for identification purposes were "mug shots." Counsel argued that such a reference would constitute evidence of other crimes and unfairly prejudice Defendants. The trial court[2] ruled that the LID photographs could be used in court, but that the state had to cover or redact any information which related to the Defendants' prior criminal histories. Defense counsel then asked that the officers who would testify about the photograph spread not refer to the photographs as "mug shots." The court stated, "I don't know what their lingo

---

[1]     Under <u>Batson</u> and its progeny, a state violates the federal constitution when it exercises its peremptory challenges to strike potential jurors on account of their race.

[2]     The Hon. Jimmie M. Edwards.

is, but whatever they refer to them, that's what it is." Defense counsel suggested that the officers should just call them photographs, and the court stated, "All right, let's move on to [the next point]." Tr. at 25-26.

## Voir Dire

After strikes for cause, there were 36 venirepersons in the qualified jury pool, of whom 12 were African-American. The State used 7 of its 12 peremptory challenges against African-Americans, including Marcia Thomas, Thomas Moorehead, and Mary McIntyre. Tr. at 270.[3]

During voir dire, the prosecutor asked the panel if anyone thought that police officers should be held to a higher standard of credibility than other witnesses. None of the three above-named individuals raised his or her hand. Tr. at 79-86. When the prosecutor asked if any members of the panel knew any other member, Thomas stated that she knew the man near to her, whose name she did not remember, because they worked for the same agency. The individual was African-American venireperson Tyrone Harrison. Thomas indicated that there was nothing about her relationship with Harrison that would keep her from sitting on the jury, and that she would be able to have an individualized opinion. Tr. at 33. Thomas also stated that her sister was a victim of an assault in 1989 or 1990, that someone was apprehended for the crime, that she was

---

[3] Although Petitioner originally challenged each of the seven African-Americans struck by the prosecution, only three strikes were challenged on appeal and in the instant petition. As such, only the relevant venirepersons will be discussed here.

satisfied with the way the police had handled the matter, and that there was nothing about the incident that would prevent her from listening to the present case.  Tr. at 86-87.

Harrison had stated earlier during voir dire that he would not hold police officers to a higher standard of credibility.  Tr. at 85.  He later stated that he had been the victim of an assault, for which no one was apprehended, and that he was not satisfied with how the police handled the case.  He stated, however, that there was nothing about the incident which would prevent him from listening to the evidence in the present case, and that he had nothing against police officers.  Tr. at 88.  Harrison was also peremptorily struck by the prosecutor after the court denied the prosecutor's request to strike him for cause.

As set forth more fully below, Petitioner at various times cited three Caucasian venireperons as similar to Thomas or McIntrye:  Paul Robnett, Scott  Elledge, and Dennis Kinion.  Venirepersons Paul Robnett and Scott Elledge stated that they knew each other because they had attended the same university and belonged to the same fraternity. Robnett indicated that there was nothing about this relationship which would cause him to not be able to sit and listen to the evidence in the case.  Tr. at 36, 274.  Robnett also stated that he had been assaulted once in 1989 and robbed once.  Robnett testified that someone was apprehended for the assault, that he was "completely" satisfied by the way the police handled his case, and that the incident would not affect his ability to listen to the evidence in the case.  Tr. at 97-98.  (Robnett and Elledge were peremptorily struck by Defense counsel.)

Dennis Kinion, also Caucasian, was not peremptorily struck by the prosecutor, but was later struck by the defense. Kinion (age 41) stated during voir dire that his close friend was involved in an attempted car jacking and robbery in 1994. He stated that he did not feel the police handled the situation very well, but that the incident did not cause him to have bad feelings about the police and he could set aside the incident and listen to the evidence in the case. Tr. at 89-90.

The Voir Dire Panel Information sheet stated that Moorehead was disabled, without any further explanation. Resp. Ex. B at 66. During voir dire, Moorehead stated that he found the doctrine of accomplice liability fair. He also responded to a question from the prosecutor that he was related to an Edward Moorehead, but not an Edward Moorehead who went to law school. Tr. at 63.

Venireperson McIntyre stated that she was assaulted in 1992, but that no one was ever apprehended for the crime. She stated she was not happy with the way the police handled her case, because it did not seem to her that they tried to apprehend the assailants. She testified that despite her experience, she did not have bad feelings toward the police and felt that she would be able to set aside what happened to her and judge this case solely on the evidence. Tr. at 98-99.

Petitioner's counsel raised a Batson objection with regard to all of the strikes against African-American venirepersons, and the court asked the prosecutor to provide race-neutral reasons. Tr. at 270. The prosecutor stated that she struck Thomas (age 33)

because she was around the same age as one of the Defendants in the case.[4] Further, the prosecutor stated that Thomas worked for the same agency as, and knew, Harrison. The prosecutor expressed concern that due to the "close nature" of the relationship between Thomas and Harrison, who was not satisfied with the police in his particular case, the two might have shared their thoughts about police officers and "their satisfaction with" police work. Defense counsel pointed out that there were "similarly-situated" non-African-American venireperson who knew each other, such as Elledge (age 27) and Robnett (age 29), whom the prosecutor did not strike. Tr. at 270-74.[5] The court found that the prosecutor had given a sufficient race-neutral reason for the use of a peremptory strike against Thomas. Tr. at 275.

With respect to Moorehead, the prosecutor stated that he seemed agitated when asked if he was related to an Edward Moorehead who went to law school. The prosecutor also noted as follows:

> [D]uring the course of voir dire Mr. Moorehead was swinging his head around in a circular motion and looking up to the ceiling and stuff, and I was concerned as to whether – I noticed that he was disabled. I didn't know if that was part of some type of ailment that he had or if he was just being disinterested.

Tr. at 278. Defense counsel stated that striking a juror because of a disability was

---

[4] At the time of trial, Petitioner was 33 and Belford was 23.

[5] Both defense attorneys participated in the <u>Batson</u> hearing, with their arguments dovetailing each other's. The Court notes that on the cover and first page of the trial transcript, the names of counsel representing each Defendant were transposed. The record reveals that, in fact, Eugene Mitchell represented Petitioner Smith and Elizabeth Haines represented Belford.

pretextual and also violated the juror's due process rights. Defense counsel also pointed out that citing demeanor as a reason to strike a venireperson was generally suspect. The court agreed that explanations relating to demeanor were generally suspect, but held that here the prosecutor's reason was "rational" and "sufficient." Tr. at 278-79.

With respect to McIntyre, the prosecutor pointed out that McIntyre stated that no one had been apprehended in her assault in 1992, and that she was not satisfied with the police officers and felt they were not trying to do their jobs. The prosecutor believed that in light of McIntyre's previous experience with police officers, she had made an assessment of what she feels a police officer's job is, and that McIntyre would hold police officers to a higher standard. Defense counsel responded that McIntyre testified that she was satisfied with her experience after her assault, and had indicated that she would not hold police officers to a higher standard than other witnesses. The court found that the prosecutor's asserted reason for striking McIntyre was sufficiently race-neutral. Tr. at 281-83. The final jury panel consisted of four African-Americans and eight Caucasians;[6] the alternate juror was African-American. Tr. at 299-302.[7]

---

[6] This is the same ratio of African-American to Caucasians presented by the original venire panel.

[7] The record leaves some confusion with regard to the alternate juror. Initially, Lilli Jamerson, an African-American, is noted as having been struck by the State. Tr. at 270 & 272. However, she is later identified as the alternate juror. Tr. at 302.

<u>**Trial**</u>

At trial, the State presented evidence that on the day in question, Gregory (Lamont) Hall, Lloyd, and Timothy Graves were walking together on the street when they met Petitioner, whom Graves knew from their old neighborhood. Lloyd and Hall continued walking ahead, with Graves and Petitioner following about a half-block behind. A few minutes later, Graves looked up and saw a man, later identified as Belford, walk between Hall and Lloyd. Tr. 419-22, 449.

Hall testified that Belford approached him and Lloyd and began swearing at them. Hall saw that Belford had a gun and told Belford that there was no need for that, but Belford kicked him and continued his epithets. Tr. 497-98. Meanwhile, Graves and Petitioner ran up to see what was going on. Graves stopped when Belford pointed the gun at him and told him to get away. As Graves backed away, Belford shot at Hall, but missed him. Petitioner then hit Lloyd twice on the back of the head with his fist. Lloyd "balled up," and Belford told him to start running. Belford then shot Lloyd. Lloyd fell to the ground, and Petitioner and Belford ran away. Tr. at 424-28, 498-500.

Graves called the police, who arrived at the scene, and Lloyd was taken to the hospital. He had been shot once in the head and once in the leg. The bones in Lloyd's face were crushed as a result of falling after being shot. Tr. at 410. Lloyd had reconstructive surgery on his face, and at the time of trial was taking drugs to prevent seizures, could no longer drive, and needed a cane to walk. Tr. at 411-12.

Graves and Hall were taken to the police station where they were each shown a photograph spread of six photographs and were asked to identify the assailants. The State introduced into evidence the LID photographs of the two defendants, which were apparently redacted to cover information other than the photographs, in accordance with the ruling on a motion in limine. Tr. at 344. Detective Timothy Kaelin testified that he was involved in preparing the photograph spreads, explaining as follows: "Well, we obtained the photographs of the suspects from the record room, and then we had numerous LID photographs in our homicide office from other incidents, and we obtained that particular group." Tr. at 354. Defense counsel objected to this testimony and moved for a mistrial.

The court overruled the motion for mistrial without giving a reason, and the trial proceeded. Tr. at 357. The following morning defense counsel renewed the motion for a mistrial based on Detective Kaelin's testimony, arguing that the testimony was a clear reference to evidence of other crimes. The court found that Detective Kaelin's testimony taken as a whole did not prejudice Defendants, because it was reasonable to infer from the testimony that the other four LID photographs were taken from the homicide office but not those of Defendants. Tr. at 372-82.

Both Graves and Hall identified Petitioner in court as the person who punched Lloyd before Belford shot him. Tr. at 420, 506. Petitioner did not offer any evidence at trial. Belford presented an alibi defense. Tr. at 559-620. In closing argument, Petitioner's counsel asked the jury to make a decision about Petitioner's case

independently of Belford's.  Counsel stated that the critical question for the jury was whether Petitioner was responsible for the conduct of another, emphasizing that the person with the gun shot Lloyd on his own, and that the only evidence against Petitioner was that he took two punches at the victim's head.  Tr. at 678-97.

The trial court accepted the State's instruction on aiding and abetting assault in the first degree, which required the jury to find that Petitioner acted with the purpose of promoting or furthering Robert Belford's commission of the crimes, and that he acted together with or aided the co-defendant in committing the offenses.  Petitioner offered an alternative instruction for third-degree assault, which required a finding that Petitioner attempted to cause physical injury to Lloyd by punching him.  Defense counsel argued that the State's evidence showed that Petitioner committed the offense of third-degree assault, but that the State failed to prove that Petitioner aided or encouraged Belford in the shooting.  Defense counsel argued that failure of the court to offer such an instruction would violate Petitioner's due process and equal protection rights.  The court rejected Petitioner's request without giving a reason.  The court also rejected Petitioner's alternative request for an instruction on second-degree assault.  Tr. at 641-47.

The jury was instructed that "[a] person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with another person with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it."  In order to convict Petitioner of first degree assault, the jury was required to find that

he "with the purpose of promoting or furthering the commission of that assault in the first degree . . . acted together with or aided Robert Belford in committing that offense . . . ." Resp. Ex. B at 117.   Judgment of acquittal was entered on two counts related to an assault on Hall.

## Direct Appeal

On direct appeal, Petitioner argued that the trial court erred in overruling the motion in limine "to preclude reference to the homicide division," and in refusing to grant a mistrial after Detective Kaelin testified that the photographs used in the investigation "were obtained from the homicide division."  Petitioner argued that this testimony was prejudicial because the evidence that Petitioner acted with the intention of assisting Belford was weak.  Resp. Ex. C at 10-15.

Petitioner also argued that the trial court's refusal to instruct the jury on the lesser-included offense of assault in the third degree violated his rights to a fair trial and due process of law because the jury could have reasonably believed that Petitioner caused physical injury rather than serious physical injury to Lloyd, and also that Petitioner lacked the requisite mental intent for aiding Belford.  Id. at 16-19.

Petitioner's final argument on direct appeal was that the trial court erred in overruling his Batson challenges, and in finding that the Prosecutor provided race-neutral explanations for the peremptory strikes against Thomas, Moorehead, and McIntyre. Petitioner argued that Thomas was similarly situated to Kinion, a Caucasian who was not struck by the prosecutor, in that Kinion also stated that he was dissatisfied with police

performance after a friend was the victim of a crime. Petitioner argued that nothing in the record gave any credence to the prosecutor's claim that Thomas would be unfavorable to the State, noting that in fact Thomas stated that she was satisfied with the way things were handled when her sister was the victim of a crime. Id. at 23-25.

Petitioner also argued that there was nothing in the record to support the prosecutor's claim that Moorehead would be unfavorable to the State or unable to serve. Petitioner argued that the prosecutor's failure to inquire about Moorehead's disability and its relationship to his ability to serve indicated the pretextual nature of the strike. Id. at 25-27. Lastly, Petitioner argued that McIntyre was also similarly situated to Kinion, in that she indicated that she had no hard feelings toward police. Furthermore, McIntyre said nothing that indicated that she would hold police to a higher standard, as was maintained by the prosecutor. Id. at 27-28.

The Missouri Court of Appeals rejected Petitioner's first contention that the trial court erred in not sustaining his motion for a mistrial because of Detective Kaelin's improper reference to other crimes, for several reasons. First, the appellate court stated that Detective Kaelin's reference to the homicide office merely identified the source of the photographs other than Defendant's to be used in the photographic spread, with Defendant's photograph coming from the record room. The court did not believe that the testimony "would support a finding that [Petitioner] had other, unrelated criminal charges or convictions." Resp. Ex. E at 2. Second, the court found there was no evidence that the challenged testimony was prejudicial, in that identification was not an issue. And

third, the appellate court noted that Petitioner's only request for relief was a motion for mistrial, which required more proof than a "possibility" of prejudice. Id. at 3.

The appellate court also concluded that the trial court did not err in refusing to submit the requested third-degree assault instruction. The court stated that Petitioner rested this claim on the contention that the jury could have concluded that he attempted to cause injury, but not serious physical injury to Lloyd. If the jury found that Petitioner and Belford acted together, the court reasoned, there was no basis for acquitting Petitioner of the offense charged and convicting him of a lesser-included offense. Concluding that there was no evidence to support a finding that Petitioner assaulted Lloyd with an independent purpose of causing physical injury, but not serious physical injury, the court denied Petitioner's appeal on this point. Id. at 3.

In rejecting Petitioner's Batson argument with regard to venireperson Thomas, the Missouri Court of Appeals noted that the prosecutor's stated reasons for striking Thomas -- that she knew and worked with Harrison, who had expressed dissatisfaction with previous police work, and might have talked with Harrison about police work -- were race neutral and "not necessarily pretextual because one white venireperson, Kinion, expressed reservations regarding police response when a friend was the victim of an attempted crime. Kinion said his friend's experience would not hinder his ability as an impartial juror." Id. at 4. The appellate court summarily noted that the prosecutor's explanation for striking venireperson Moorehead -- thinking he was agitated by the question about an Edward Moorehead and observing his odd behavior during voir dire --

was sufficient. Finally, with regard to venireperson McIntyre, the appellate court distinguished her from other venirepersons who expressed reservations with police work, because McIntyre expressed reservations regarding her own personal experience as a victim. In sum, the appellate court concluded that the "explanations given and accepted by the [trial] court, are race neutral and more than sufficient." Id. at 4-5.

## DISCUSSION

Standard of Review

 Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

The "contrary to" clause is satisfied if a state court has arrived "'at a conclusion opposite to that reached by [the Supreme Court] on a question of law'" or "'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent'" but arrives at the opposite result. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413; Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003).

A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be "unreasonable."  Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is both wrong and unreasonable").  The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to "an even more deferential review."  Id.  Factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only by "clear and convincing evidence." § 2254(e)(1); Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001).  "The standard is demanding but not insatiable; . . . deference does not by definition preclude relief."  Miller-El v. Dretke, 125 S. Ct. 2317, 2325 (2005).

## Police Officer's Testimony Implying Other Bad Acts

Petitioner argues that his right to a fair trial was violated by the trial court's denial of his motion for a new trial following Detective Kaelin's testimony that when preparing the photograph spread for identification, he obtained Petitioner's photograph from police files.[8] For purposes of habeas review under § 2254, therefore, this Court considers only whether the state trial court's evidentiary ruling rendered Petitioner's trial "fundamentally unfair."

---

[8]    The court notes that Petitioner is not challenging the admission of the photographs.

See Weston v. Dormire, 272 F.3d 1109, 1113 (8th Cir. 2001). "To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety the verdict probably would have been different." Gee v. Groose, 110 F.3d 1346, 1350 (8th Cir. 1997); see also Bounds v. Delo, 151 F.3d 1116, 1119 (8th Cir. 1998).

The Supreme Court has explicitly left open the question of whether the admission of evidence of other crimes solely to prove propensity violates due process. See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). As petitioner cannot point to any holding of the Supreme Court that supports his claim, it cannot be said that the Missouri Court of Appeals' decision rejecting this due process challenge was "contrary to" any "clearly-established" federal law as determined by the Supreme Court. See Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003); Hirsch v. Brigano, 2003 WL 21949184, at *3 (6th Cir. 2003); cf. Kane v. Garcia Espitia, 126 S. Ct. 407, 408 (2005) (per curiam) (reversing grant of habeas relief where Supreme Court case relied upon did not clearly establish right petitioner claimed was violated).

Furthermore, although the challenged evidence may well have been prejudicial, the Court cannot say that it so infected the trial as to violate Petitioner's due process right to a fair trial. Detective Kaelin's comment did not specify that Petitioner's photograph was from the homicide unit, but only that it was from the record room, somewhat lessening the

prejudicial nature of the testimony.  There were no additional comments by Detective

Kaelin linking Petitioner to other prior bad acts, and the evidence of Petitioner's guilt was

strong, namely the testimony of two eye witnesses that he struck Lloyd in the head,

knowing that Belford had a gun, and just prior to Belford shooting Lloyd.  See Loggins v.

Hannigan, 2002 WL 1980469, at *2 (10th Cir. 2002) (police officer's references during

trial to habeas petitioner's "mug shots" did not violate his right to due process in light of

the overwhelming evidence against him); Young v. Bowersox, 161 F.3d 1159, 1161 (8th

Cir. 1998) (prosecutor's question improperly suggesting to the jury that habeas petitioner

had prior bad acts did not violate petitioner's right to a fair trial where question did not

refer to any specific past acts, and evidence of petitioner's guilt was strong); Ivy v.

Bowersox, 122 F.3d 675, 676 (8th Cir. 1997) (introduction of other-crimes evidence did

not so infect trial so as to warrant federal habeas relief in light of other evidence of

petitioner's guilt); Robinson v. Leapley, 26 F.3d 826, 832 (8th Cir. 1994) (same, citing

Estelle, 502 U.S. at 67).  In sum, the Court concludes that the state courts' handling of this

issue was not legally or factually unreasonable.

**Jury Instructions**

Petitioner argues that because his only theory of defense was that he did not aid or

encourage Belford, the trial court's refusal to instruct the jury on the lesser-included

offense of third degree assault denied him of his constitutional right to a fair trial in

violation of the Fourteenth Amendment.

Under Missouri law, third-degree assault is a lesser-included offense of first-degree assault, with the latter requiring that a defendant knowingly causes or attempts to cause serious physical injury to another person, and the former requiring that a defendant recklessly engages in conduct which creates a grave risk of serious injury or death. State v. Garrison, 975 S.W.2d 460, 461 (Mo. Ct. App. 1998). A person may be held criminally liable for a first-degree assault committed by another if "before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Mo. Rev. Stat. § 562.041. In determining whether a person has aided in the commission of an offense, presence at the crime scene, a refusal to interfere, and encouragement must all be considered together; encouragement can include gestures, words, or signs that indicate approval of the criminal act of another. State v. Barnum, 14 S.W.3d 587, 591 (Mo. 2000).

In Beck v. Alabama, 447 U.S. 625, 627 (1980), a capital murder case, the Supreme Court held that failure to charge lesser-included noncapital offenses, where the evidence warranted such a charge, violates the Eighth Amendment and the Due Process Clause. In Hopper v. Evans, 456 U.S. 605, 612 (1982), also a capital murder case, the Supreme Court explained that due process requires that a lesser-included offense instruction be given only "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater."

The Supreme Court, however, specifically noted in Beck that it was not deciding

whether due process required the giving of lesser-included offense instructions in noncapital cases. <u>Beck</u>, 447 U.S. at 638 n.14. Several circuits have since held that the failure to instruct on a lesser-included offense in a noncapital case does not present a federal constitutional question cognizable under habeas corpus. <u>See</u> <u>Robertson v. Hanks</u>, 140 F.3d 707, 710 (7th Cir. 1998) (citing cases from the 5th, 9th, 10th, and 11th Circuits).

In <u>Pitts v. Lockhart</u>, the Eighth Circuit held that "the failure to give a lesser included offense instruction in a noncapital case rarely, if ever, presents a constitutional question." 911 F.2d 109, 112 (8th Cir. 1990); <u>accord</u> <u>Green v. Groose</u>, 959 F.2d 708, 709 (8th Cir. 1992) (per curiam). The state courts' determinations that a lesser-included offense instruction was not required here cannot be said to be contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." <u>See</u> <u>Paulding v. Allen</u>, 303 F. Supp. 2d 26, 31 (D. Mass. 2004); <u>Rodgers v. Stine</u>, 73 F. Supp. 2d 778, 784 (E.D. Mich. 1999); <u>cf.</u> <u>Kane</u>, 126 S. Ct. at 408 (reversing grant of habeas relief where Supreme Court case relied upon did not clearly establish right petitioner claimed was violated).

**<u>Petitioner's Batson Claims</u>**

Petitioner argues that the State used three of its peremptory challenges to strike members of the venire panel because they were African-American, in violation of <u>Batson</u>. The Supreme Court has adopted a three-part test to determine whether a peremptory strike violates the Constitution. First, the defendant must establish a prima facie case showing discriminatory use of peremptory strikes by the prosecutor. Second, if the defendant makes

a prima facie showing, the State must offer a racially (or gender) neutral explanation for the challenges. The State's explanation need not justify a challenge for cause, or be persuasive, or even plausible. Third, the trial court must decide whether the defendant has established purposeful discrimination. <u>Miller-El</u>, 125 S. Ct. at 2331; <u>Purkett v. Elem</u>, 514 U.S. 765, 767-68 (1995) (per curiam); <u>Hall v. Luebbers</u>, 341 F.3d 706, 712-13 (8th Cir. 2003); <u>Weaver v. Bowersox</u>, 241 F.3d 1024, 1028 n.1 (8th Cir. 2001).

Assuming the prosecutor satisfies his burden of production, the trial court must then assess the prosecutor's credibility to determine if the reason(s) he proffered genuinely motivated him to strike the juror. At this stage in the analysis, <u>Batson</u> permits the defendant to rely on all relevant circumstances to challenge the prosecutor's credibility because, as the <u>Miller-El</u> Court recently explained, if any facially neutral reason sufficed to answer a <u>Batson</u> challenge, <u>Batson</u> would essentially be meaningless. <u>Miller-El</u>, 125 S. Ct. at 2325.

In <u>Miller-El</u>, the Supreme Court expressly stated that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove discrimination to be considered at <u>Batson</u>'s third step." <u>Miller-El</u>, 125 S. Ct. at 2325. The Court there rejected a rule that no comparison is probative unless the situation of the individuals is identical in all respects. <u>Id.</u> at 2329 n.6. The Court found that the prosecutor's strike of a certain venireperson violated <u>Batson</u> where there were "strong similarities as well as some differences," between him and nonblack jurors, because the differences seemed "far from significant,"

particularly when the struck venireperson's testimony was read in its entirety.  Id. at 2329.
See also Williams v. Groose, 77 F.3d 259, 261-62 (8th Cir. 1995) (otherwise neutral
explanation for removing African-American juror may be pretextual if stated reason also
applies to white juror who is not removed).   Furthermore, "a prosecutor must state his
reasons as best he can and stand or fall on the plausibility of the reasons he gives."  Miller-
El, 125 S. Ct. at 2332.

        In a federal habeas case raising a Batson challenge, each step of the Batson inquiry
involves a factual determination entitled to a presumption of correctness unless overcome
by clear and convincing evidence under § 2254(e)(1).  Weaver, 241 F.3d at 1030 (a federal
habeas court's "deference to trial court fact-finding is doubly great when considering
Batson challenges because of the unique awareness of the totality of the circumstances
surrounding voir dire") (citation omitted).

        Here, the Court first concludes that the state courts' adjudication of Plaintiff's
Batson claim with respect to venireperson Moorehead was not factually or legally
unreasonable.  The prosecutor based his strike of Moorehead upon Moorehead's demeanor
during voir dire, and specifically that he appeared agitated in response to a question, and
was swinging his head in a circular motion and looking up at the ceiling, perhaps because
he was disinterested.  The trial court agreed that this reason was "rational" and sufficient."
The trial court is in the best position to observe the totality of circumstances of voir dire,
especially with regard to information "that will not be evident from a reading of the record,
such as the ability to evaluate general demeanor, to observe attention span, alertness, and

interest . . . ." Id.; see also Simmons v. Leubbers, 299 F.3d 929, 942 (8th Cir. 2002) (deferring to state court's acceptance of prosecutor's reasons for striking an African-American venireperson where reasons were predicated upon prosecutor's observation of venireperson's behavior during voir dire); Troupe v. Groose, 72 F.3d 75, 76 (8th Cir. 1995) (prosecutor's explanation that she used peremptory challenge against an African-American because he had offensive demeanor  and was uncommunicative supported trial court's determination that prosecutor did not use peremptory challenge in discriminatory manner in violation of Batson; "Although a trial court might be less inclined to believe subjective reasons than objective ones, . . . the trial court chose to believe the prosecutor's race-neutral justifications, and we defer to the trial court's assessment of the prosecutor's credibility in this habeas proceeding.").  Petitioner failed to overcome with clear and convincing evidence the presumption of correctness afforded the trial court's findings as to Moorehead.

The Court next concludes that the state courts' findings and conclusions with respect to McIntyre were not legally or factually unreasonable.  McIntyre testified that she was not satisfied with the way the police had handled her own assault case, whereas Kinion, the Caucasian venireperson Petitioner contended on direct appeal was similarly situated to McIntyre, stated that he was not happy with the way the police had handled a case in which his close friend, not he himself, had been the victim.  Moreover, McIntyre stated that it "seemed like the police didn't try," and when asked if she had bad feelings toward the police as a result responded, "No, not really."  Kinion expressed no such feelings.  The Court further notes that defense counsel did not raise the Kinion comparison

to the trial court.

The Court believes that a far closer question is presented with respect to venireperson Thomas. As noted above, the reasons proffered by the prosecutor for striking Thomas were that she was about the same age as one of the Defendants, and that she worked with Harrison, who was dissatisfied with the way the police had handled his assault case. The prosecutor expressed concern that due to the "close nature" of Thomas's relationship with Harrison, they may have discussed his dissatisfaction with police work. The record does not support the prosecutor's characterization of Thomas's relationship with Harrison as "close." Furthermore, Robnett and Elledge, the two Caucasian venirepersons who Petitioner claimed to the trial court were similarly situated to Thomas, were close to Thomas's age. And Thomas stated that she was satisfied with how the police handled her sister's assault case. Nevertheless, the Court concludes that the state courts' adjudication of Petitioner's <u>Batson</u> claim with respect to Thomas cannot be said to have been unreasonable.

The Court first notes that Petitioner did not present the same arguments on this matter to the trial court and to the Missouri Court of Appeals. At the <u>Batson</u> hearing, defense counsel argued that Thomas was similarly situated to Caucasian venirepersons who knew each other, specifically Elledge and Robnett, who were not stricken. On direct appeal, Petitioner argued that Thomas was similarly situated to Kinion, who had stated during voir dire that he did not think the police handled the attempted car jacking of his close friend very well. In his present habeas petition, Petitioner does not elaborate at all on

the basis of his claim that the prosecutor "failed to present race-neutral explanations for the peremptory strikes of jurors Thomas, Moorehead and McIntyre."

The Court will assume that Petitioner has preserved for federal habeas review the factual basis for his Batson claim with regard to Thomas that he presented to the trial court, even though this basis was not presented to the state appellate court.  See Miller-El, 125 S. Ct. at 2326 n.2 (proper for federal habeas court to consider comparisons between African-American and Caucasian panelists where the specific comparisons were not argued to the state courts, because evidence and legal theory were before those courts).  The Court concludes that the trial court's rejection of Petitioner's Batson argument based upon a comparison between Thomas and Elledge or Robnett was not unreasonable.  The venireperson whom Thomas knew was unsatisfied with how the police had handled his own assault case, in contrast to Robnett, who testified that he was "completely" satisfied with how his own assault case was handled by the police.  Tr. at 98.  The Court concludes that this is not an insignificant dissimilarity.  Though Thomas's relationship with Harrison may not have been "close," the comparison to Ellege and Robnett is not sufficient, in light of the dissimilarities, to overcome the presumption of correctness and the high degree of deference to be accorded a state trial court's Batson findings.  Cf. Hall, 341 F.3d at 714 (Batson claim rejected in capital case because even though Caucasian venireperson whom prosecutor did not strike indicated that she would hold the state to a higher burden of proof than an African-American venireperson whom prosecutor did strike may have indicated, only the African-American also indicated a preference for life without parole over the death

penalty); <u>Williams</u>, 77 F.3d at 261-62 (8th Cir. 1995) (prosecutor's explanation that peremptory strike was used against African-American panelist because his nephew had been arrested for assault and found not guilty and panelist might therefore sympathize with defendant was not pretextual, even though prosecutor failed to strike Caucasian panelist whose daughter had been convicted of manslaughter; situations were not similar).

The state appellate court's rejection of Petitioner's <u>Batson</u> claim based upon a comparison between Thomas and Kinion also presents a close question. Kinion testified that he did not feel the police handled a case in which his close friend was the victim of a crime in 1994 very well, whereas Thomas stated she was satisfied with how the police handled a case in which her sister was the victim in 1989 or 1990. But there are dissimilarities between them. Petitioner and Thomas were the same age, whereas Kinion was eight years older, <u>see</u> <u>United States v. Clemmons</u>, 941 F.3d 321, 325 (5th Cir. 1991) (a venireperson being the same age as defendant is a valid race-neutral reason for use of a peremptory strike), and there is no suggestion that Kinion knew anyone on the venire panel with whom he might discuss his dissatisfaction with the police. Again, in light of the very limited standard of habeas review of a state court's adjudication of a <u>Batson</u> claim, the Court concludes that Petitioner is not entitled to relief on this claim. The Court further notes that there is no allegation or evidence in this case of disparate questioning of African-American and Caucasian potential jurors, or other racially-motivated improprieties, such as jury-shuffling, as were present in <u>Miller-El</u>. The Court's careful review of the record does not support Petitioner's claim that race was a factor in determining who was challenged

and who was not.

## CONCLUSION

The Court concludes that Petitioner is not entitled to habeas relief. The Court does not believe that reasonable jurists might find the Court's decision debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2253(c)(1)(A). See Miller-El v. Cockrell, 537 U.S.473, 484 (2003) (standard for issuing a Certificate of Appealability) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of Kevin Smith for habeas corpus relief be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability should not issue in this case.

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that the failure to file timely objections may result in a waiver of the right to appeal questions of fact.


*Audrey G. Fleissig*
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of December, 2005.